EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Nicolás Gautier Vega, en su Capacidad Oficial como Comisionado Electoral del Partido Popular Democrático y otros<br><br>Recurridos<br><br>v.<br><br>Héctor Joaquín Sánchez, en su Capacidad Oficial como Comisionado Electoral del Partido Nuevo Progresista<br><br>Peticionario | Certiorari<br><br><br>2020 TSPR 124<br><br>205 DPR \_\_\_\_\_ |

Número del Caso:  CC-2020-376


Fecha:  13 de octubre de 2020


Tribunal de Apelaciones:

    Panel IV


Abogado de la parte peticionaria,
Comisionado Electoral del Partido
Nuevo Progresista:

    Lcdo. Carlos F. Vera Muñoz


Abogados del Comisionado Electoral
del Partido Popular Democrático:

    Lcdo. Jorge Martínez Luciano
    Lcdo. Emil Rodríguez Escudero
    Lcdo. Gerardo Cruz Maldonado

Abogados del Presidente de la
Comisión Estatal de Elecciones:

    Lcdo. Jason Caraballo Oquendo
    Lcdo. Felix R. Passalaqua Rivera

Abogado del Comisionado Electoral
Del Proyecto Dignidad:

    Lcdo. Edwardo García Rexach

Abogado del Comisionado Electoral del
Movimiento Victoria Ciudadana:

    Lcdo. Olvin Ángel Valentín Rivera

Materia: Derecho Electoral: Es válido el Acuerdo suscrito por los Comisionados Electorales de los partidos políticos fundamentado en el mandato expreso de la Resolución Conjunta 37-2020 con el fin recalendarizar las solicitudes de recusaciones de los electores.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

**EN EL TRIBUNAL SUPREMO DE PUERTO RICO**

| | |
|---|---|
| Nicolás Gautier Vega, en su Capacidad Oficial como Comisionado Electoral del Partido Popular Democrático y otros<br><br>Recurridos<br><br>v.<br><br>Héctor Joaquín Sánchez, en su Capacidad Oficial como Comisionado Electoral del Partido Nuevo Progresista<br><br>Peticionario | CC-2020-0376 |

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

En San Juan, Puerto Rico, a 13 de octubre de 2020.

En el presente caso, un acuerdo unánime de los Comisionados Electorales de los partidos políticos, adoptado en cumplimiento de una normativa especial ordenada por la Asamblea Legislativa por motivo de la actual pandemia, fue dejado sin efecto por los foros *a quo*. Tal determinación de los foros *a quo*, fundamentada en una legislación aprobada con posterioridad a ese acuerdo, afectó los derechos del elector, de los propios partidos políticos y del interés público. Ante tal escenario, existen consideraciones de debido proceso de ley que no se pueden obviar, y que demandan el mejor esfuerzo posible para intentar armonizar los textos en controversia.

Como es de conocimiento general, la pandemia ocasionada por la enfermedad del coronavirus (COVID-19) afectó el calendario de los eventos electorales. El trámite de las recusaciones no fue la excepción. Ante un asunto electoral novel, estamos obligados a intervenir para determinar la validez de un Acuerdo mediante el cual los Comisionados Electorales de los partidos políticos inscritos en la Comisión Estatal de Elecciones (CEE) acordaron, específicamente y de manera unánime, que el período para solicitar recusaciones de electores sería desde el 11 de junio de 2020 hasta el 11 de julio de 2020 y no el 30 de junio de 2020 como dispone el Art. 5.17 de la Ley Núm. 58-2020, según enmendada, conocida como el Código Electoral de Puerto Rico de 2020 (Código Electoral de 2020). Ante el claro principio general de que una ley de carácter especial sobre la materia prevalece sobre una de carácter general, concluimos que la Resolución Conjunta 37, *infra*, es una ley especial, que facultó a los comisionados electorales a aprobar el referido acuerdo. Por lo tanto, el término para la presentación de las recusaciones culminó el 11 de julio de 2020 y no el 30 de junio de 2020, como establece el Código Electoral de 2020. Veamos.

## I

El 11 de junio de 2020 los Comisionados Electorales de todos los partidos políticos suscribieron el *Calendario electoral revisado-período de recusación de electores*,

CEE-AC-20-150 (Acuerdo).[1] Como mencionáramos, éste tuvo el propósito de extender el período para la presentación de las recusaciones hasta el 11 de julio de 2020. Como parte del trámite, el Secretario de la CEE, emitió una certificación en la que transcribió el Acuerdo y, en lo pertinente, la misma dispone lo siguiente:

> Discutido el asunto, se acuerda que el Secretario estará circulando el Calendario revisado para ser aprobado vía Referéndum. **Se acuerda, además, que el período de recusaciones de electores será desde hoy, 11 de junio al 11 de julio de 2020.**

Así las cosas, el **8 de julio de 2020** el Sr. Isaías Medina Morales, Comisionado Electoral Alterno del Partido Nuevo Progresista (PNP) del Precinto 8 del Municipio de Cataño (Precinto 8) presentó 21 solicitudes de recusación. El Presidente de la Comisión Local denegó la expedición de las citaciones por edicto porque, según expuso, el Art. 5.17 del Código Electoral de 2020, *supra*, dispone que el período para presentar las solicitudes de recusaciones culminaba el **30 de junio de 2020.** Inconforme, el Comisionado Electoral Alterno del PNP del Precinto 8 apeló la decisión ante la CEE, sin embargo, los Comisionados Electorales no llegaron a un consenso. Por tal motivo, el entonces Presidente de la CEE, Hon. Juan E. Dávila Rivera (Presidente de la CEE), atendió el

---

[1] La Certificación del *Calendario electoral revisado-período de recusación de electores*, CEE-AC-20-150, suscrita por el secretario de la Comisión Estatal de Elecciones, Sr. Ángel L. Rosa Barios, puede ser consultada en el portal de la entidad: https://ww2.ceepur.org/sites/ComisionEE/es-pr/Secretaria/Acuerdos/Calendario%20electoral%20revisado%20-%20Recusaciones.pdf (última visita, 2 de octubre de 2020).

asunto y resolvió que el Comisionado Electoral Alterno del PNP del Precinto 8 presentó oportunamente las solicitudes de recusación. La Resolución de la CEE se fundamentó en que, conforme a una interpretación integral del Art. 5.17 del Código Electoral de 2020, *supra*, y la Sec. 2 de la Resolución Conjunta 37-2020, la R. C. del S. 556 de 4 de junio de 2020, 7ma Ses. Ord. 18va Asam. Leg. (Resolución Conjunta 37), el Acuerdo es válido y, por ende, **el término para presentar recusaciones vencía el 11 de julio de 2020 y no el 30 de junio de 2020.** Según esgrimió, **las comisiones locales descansaron en la determinación de la CEE para llevar a cabo el proceso de recusaciones en este año electoral.**[2]

Inconforme con la decisión, el entonces Comisionado Electoral del Partido Popular Democrático (PPD) el Lcdo. Lind O. Merle Feliciano, presentó una *Petición de revisión judicial* ante el Tribunal de Primera Instancia. En esencia, señaló que el Presidente de la CEE erró al concluir que se pueden presentar solicitudes de recusaciones fuera de la fecha dispuesta en el Art. 5.17 del ordenamiento jurídico electoral. Esto es, luego de 30 de junio de 2020.

Por otro lado, el Presidente de la CEE presentó una *Moción en cumplimiento de orden y solicitando desestimación*. En la misma abundó que la Resolución Conjunta 37 se aprobó para atender las complicaciones que afectaron el calendario electoral a raíz del cierre del Gobierno el 16 de marzo de 2020 y mediante ésta se delegó a la CEE el poder para posponer las distintas fechas de trámites electorales.

---

[2] Resolución RS-20-142, Pág. 8.

Cónsono con esa autoridad, los Comisionados Electorales aprobaron por unanimidad el Acuerdo para extender las peticiones de recusaciones hasta el 11 de julio de 2020.

Además, argumentó que acorde con el entonces Art. 6.018 de la Ley Núm. 78-2011 conocida como el Código Electoral de Puerto Rico para el Siglo XXI (Código Electoral para el Siglo XXI) el plazo para culminar la presentación de recusaciones, de todos modos, hubiese vencido el 30 de abril del año electoral. A pesar de que la Resolución Conjunta 37 se aprobó durante la vigencia del Código Electoral para el Siglo XXI, planteó que la Sec. 11 de aquélla establece que "[p]ara fines de esta Resolución Conjunta, cualquier referencia al Código Electoral significará el "Código Electoral de Puerto Rico para el Siglo XXI", Ley 78-2011, según emendada, o cualquier ley que lo sustituya". A su juicio, cuando se aprobó el Código Electoral de 2020 el 20 de junio de 2020 no se derogó expresamente la Resolución Conjunta 37 y, para el nuevo ordenamiento jurídico electoral, las solicitudes de recusaciones se supone que se hubiesen presentado al 30 de abril del año de las Elecciones Generales, al igual que el Código Electoral para el Siglo XXI.

Así las cosas, el tribunal de primera instancia emitió una *Sentencia*[3] en la que **revocó la Resolución de la CEE fundamentado en que el Art. 5.17 del Código Electoral de 2020,** *supra*, **establece que la fecha en que termina el período de recusación es el 30 de junio de 2020.** En desacuerdo, el

---

[3] Apéndice de la Petición de *certiorari*, págs. 89-102.

Presidente de la CEE acudió ante el Tribunal de Apelaciones y expuso que el foro de instancia erró al interpretar de forma literal la interacción entre el Código Electoral de 2020 y la Resolución Conjunta 37, **provocando que su determinación resultase en una injusticia que perjudica la pureza de los procesos electorales.** El 11 de septiembre de 2020 el foro apelativo intermedio emitió una *Sentencia* en la que confirmó al foro de instancia.  En lo pertinente, el Tribunal de Apelaciones expresó lo siguiente:

> Vemos, en la Resolución Conjunta, no se fijó un nuevo término para las recusaciones, sino que, de forma generalizada, se delegó a la Comisión recalendarizar los asuntos que vencieran en el período específicamente mencionado dada la emergencia. En tal escenario, se justificaba el recalendarizar la fecha de las recusaciones, pues no existía otra disponible. Así pues, el 11 de junio de 2020 todos los comisionados acordaron por unanimidad ampliar el término hasta el 11 de julio de 2020. En ese entonces, esa era la fecha que regía dicho procedimiento al carecer de otra directriz al efecto. Esa parte del Acuerdo se mantuvo vigente hasta que entró en vigor, días después, la Ley Núm. 58-2020, que en su Artículo 5.1[7] dispuso que "para propósitos de las Elecciones Generales de 2020, el período de recusaciones culminará el 30 de junio de 2020."[…]

> Esta determinación es la última voluntad del Legislador, que prevalece sobre una Ley anterior o cualquier determinación administrativa de la Comisión. Al existir una nueva fecha para las recusaciones, el Acuerdo entre las partes perdió eficacia sobre este particular.

> En fin, la interpretación dada por el TPI valida la letra clara [del Código Electoral de 2020], que entró en vigor

luego de emitida la Resolución Conjunta. Con ello, se estableció una fecha específica para las recusaciones, tornando inoperante los acuerdos que a esos fines arribó la Comisión. La nueva ley estableció un término respecto a recusaciones en este ciclo electoral de 2020, al establecerlo el        30 de junio de 2020. Ante el lenguaje claro e inequívoco [del Código Electoral de 2020], respecto a las fechas de las recusaciones, nada nos queda por armonizar. Todo lo que era contrario a ello, quedó sin efecto y derogado.[4]

Infructuosamente, el Sr. Héctor Joaquín Sánchez, Comisionado Electoral del PNP, solicitó la reconsideración del dictamen del foro apelativo intermedio, por ello recurrió ante nos mediante una Petición de *certiorari*. En esencia, y como cuestión de umbral, plantea la necesidad de que este Tribunal interprete el Art. 5.17 del Código Electoral de 2020, *supra* y la Resolución Conjunta 37, **porque los foros *a quo* no consideraron las circunstancias extraordinarias que requirieron la aprobación de ésta ni analizaron la intención legislativa al aprobar ambas legislaciones. Ello pues, según entiende, la interpretación realizada por los foros *a quo* tuvo un resultado absurdo que afectó la pureza y la transparencia del sufragio.**

En síntesis, el Comisionado Electoral del PNP recalcó los argumentos que el Presidente de la CEE expuso respecto a la delegación de poderes a la CEE que emanan de la Resolución Conjunta 37 para ajustar el calendario electoral, cuya validez no se derogó con la aprobación posterior del Código

---

[4] Apéndice de la Petición de *certiorari*, págs. 122-123.

Electoral de 2020. Por lo tanto, debido a que la fecha de 30 de abril de 2020 para la presentación de las recusaciones no varió con la aprobación del Código Electoral de 2020, este procedimiento estaba dentro de los trámites vencederos que dispuso la Sec. 2 de la Resolución Conjunta 37, *supra*, para poder ampliar el término de las solicitudes de recusaciones que se afectaron como consecuencia del cierre del Gobierno el 16 de marzo de 2020. Luego de que las partes expusieran sus posiciones, estamos listos para resolver.

II

## A. El mecanismo legislativo de la resolución conjunta

La Constitución de Puerto Rico dispone que "[s]e determinará por ley los asuntos que puedan ser objeto de consideración mediante resolución conjunta, pero toda resolución conjunta seguirá el mismo trámite de un proyecto de ley".[5] La Convención Constituyente discutió ampliamente las diferencias prácticas entre una resolución conjunta y un proyecto de ley.[6] La posición imperante tras el debate habido fue que la resolución conjunta se podría utilizar como un mecanismo para legislar asuntos de naturaleza especial, particular, específica y transitoria o sin consecuencias ulteriores.[7] Por lo tanto, la resolución conjunta es para un

---

[5] Sec. 18 del Art. III, Const. ELA, LPRA Tomo 1, ed. 2016, pág. 413.

[6] Véase, 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 856-863 (1952).

[7] Íd., pág. 862.

fin determinado en el tiempo y una vez éste se ha cumplido la ley deja de existir.[8]

Conforme al mandato constitucional antes citado, la Asamblea Legislativa aprobó la Ley para Determinar los Asuntos que Deban Ser Objeto de Consideración por la Asamblea Legislativa Mediante Resolución Conjunta.[9] De esta disposición surge que la resolución conjunta sería "[t]oda legislación que haya de perder su fuerza al realizarse la obra, o cumplirse la finalidad que persigue,[…] y [que] no formará parte de los estatutos permanentes de Puerto Rico".[10] No obstante, esta disposición excluyó de este mecanismo "aquellos casos en que la materia que deba considerarse como resolución conjunta sea parte necesaria, aunque incidental, de una materia principal que deba considerarse mediante proyecto de ley". Es decir, no puede ser objeto de resolución conjunta materia para regular un asunto general que deba ser establecido permanentemente en una ley.

Esta sección es cónsona con la discusión que hubo en la Convención Constituyente respecto a las diferencias prácticas entre una resolución conjunta y un proyecto de ley. La posición que imperó es que la resolución conjunta sería utilizada como un mecanismo para legislar asuntos de **naturaleza especial, particular, específica y transitoria.**

---

[8] C.R.I.M. v. Méndez Torres, 174 DPR 216, 229 (2008).

[9] Ley Núm. 2 de 4 de marzo de 1953, 2 LPRA secs. 200-201.

[10] Sección 1, Ley Núm. 2 de 4 de marzo de 1953, 2 LPRA sec. 200.

Así, la única diferencia entre una ley y una resolución conjunta estriba en que la última pierde su fuerza al realizarse la obra o cumplirse la finalidad que persigue y una ley tendrá fuerza permanente hasta tanto sea enmendada o derogada. Por lo tanto, es incuestionable que, una vez aprobadas, ambas tienen fuerza de ley y, en consecuencia, obligan tanto a la ciudadanía como al Estado en su cumplimiento. Esto es de tal relevancia que la Sec. 3 de la Ley 2, supra, provee para que ninguna medida sea declarada inválida por haberse aprobado mediante una resolución conjunta en vez de una ley o a la inversa. Además, este precepto responde al requisito constitucional de que la resolución conjunta, contrario a una resolución concurrente, cumpla con el mismo trámite de un proyecto de ley. En otras palabras, una resolución conjunta es **una ley** aprobada con un propósito especial o particular y con una vigencia limitada o definida.

En resumen, y para recapitular, lo anterior refleja que, tanto una ley como una resolución conjunta, atraviesan por el mismo procedimiento de aprobación; una vez vigente, y debido a que recogen el mandato legislativo por el cual se crearon, contienen la misma fuerza; solamente la Asamblea Legislativa puede enmendar o derogar lo dispuesto mediante éstas; **e implica que a través del mecanismo de la resolución conjunta se pueda tramitar un asunto especial**

**dentro del carácter general de una ley que trate de una materia específica.**[11]

**B. Resolución Conjunta 37 y Código Electoral de 2020**

A raíz de la pandemia provocada por el COVID-19, se cerraron las operaciones del Gobierno, incluyendo la CEE, a partir del 15 de marzo de 2020. Debido a la continuación de la situación de emergencia de salud pública, surgió entonces la necesidad de aplazar la apertura de las operaciones gubernamentales. En atención al cierre y al calendario electoral, según le permitía el entonces vigente Art. 8.009 del Código Electoral para el Siglo XXI, la Legislatura precisó aprobar la Resolución Conjunta 37, con el fin de dilatar por 2 meses la celebración de las primarias.

Así, el propósito **especial o particular** de la Asamblea Legislativa al aprobar la Resolución Conjunta 37 surge claramente de su Exposición de Motivos:

> La Asamblea Legislativa entiende que, debido al estado de emergencia de salud pública que enfrenta Puerto Rico en estos momentos, es imperativo tomar la decisión de posponer la celebración de las primarias de los partidos políticos, señalada para el domingo 7 de junio de 2020. Anticipando que la preparación para el evento primarista se ha atrasado por cerca de dos (2) meses, entendemos prudente posponer las primarias hasta el domingo, 9 de agosto de 2020. Además, mediante esta Resolución Conjunta, se proveen los mecanismos necesarios para poder llevar a cabo de manera segura, en cumplimiento con las nuevas normas de distanciamiento social requeridas a raíz

---

[11] <u>Santini Guadier v. CEE</u>, 185 DPR 522, 536 (2012) (Sentencia).

de la pandemia y garantizando el derecho de cada ciudadano a ejercer el voto libre y voluntariamente.

Consecuentemente, en la Sec. 2 de la Resolución Conjunta 37, *supra*, la Asamblea Legislativa le delegó a la CEE el poder para revisar y ajustar el calendario electoral. Como parte de ese ajuste, la referida sección estableció lo siguiente:

> Cualquier otro trámite cuya fecha establecida en el calendario electoral que **haya vencido durante el período comprendido entre el 16 de marzo de 2020 y la fecha de la aprobación de esta Resolución Conjunta,** <u>**será extendido por la Comisión en el calendario electoral revisado**</u> según las disposiciones de esta Sección.[12]

Por otro lado, la Sec. 11 de la Resolución Conjunta 37 dispone que "[p]ara fines de esta Resolución Conjunta, cualquier referencia al Código Electoral significará el "Código Electoral de Puerto Rico para el Siglo XXI", Ley 78-2011, según emendada, o cualquier ley que lo sustituya". La ley sustituta del "Código Electoral de Puerto Rico para el Siglo XXI" vino a ser el Código Electoral de 2020 que entró en vigor inmediatamente después de su aprobación el 20 de junio de 2020, y que derogó varias disposiciones legales, incluyendo el propio Código Electoral para el Siglo XXI. No obstante, el Código Electoral de 2020 no derogó la Resolución Conjunta 37, *supra*, por lo que en

---

[12] Apéndice de la Petición de *certiorari*, págs. 139-140.

virtud de la Sección 11 de esta última, ambas coexisten para fines de la administración del calendario electoral.

## C. Procedimiento de recusación y el derecho a un debido proceso de ley

En el ámbito electoral, la recusación se define como el procedimiento para impugnar el estatus de un elector en el Registro General de Electores (Registro).[13] Una recusación tiene dos propósitos: por un lado, procura anular una petición de inscripción, excluir o inactivar a un elector del Registro; y por el otro, la recusación es el acto de objetar el voto de un elector durante la celebración de una votación.[14] Toda recusación deberá cumplir con los requisitos en ley.[15] El Art. 5.16 del Código Electoral 2020 establece los fundamentos por los cuales un elector puede ser recusado, entre los cuales se encuentra el domicilio del elector.[16]

---

[13] Art. 2.3(94) de la Ley Núm. 58-2020, según enmendada, conocida como Código Electoral de Puerto Rico de 2020 (Código Electoral de 2020).

[14] Art. 2.3(94) del Código Electoral de 2020, *supra*. Es menester señalar que la controversia ante nuestra consideración no se relaciona con la recusación de un voto que surge durante un evento comicial. Sin embargo, es preciso destacar que hemos considerado que ese tipo de recusación es un entredicho contra la validez de un voto y que al momento en que se suscita una recusación en un colegio de votación, tiene consecuencias de entronque constitucional pues se pierde la secretividad del voto que garantiza la Sec. II del Art. 2 de la Constitución de Puerto Rico. Sec. 4 del Art. VI Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 283. Véase PPD v. Admor. Gen. de Elecciones, 111 DPR 199, 227-28 (1981).

[15] Art. 2.3(94) del Código Electoral de 2020, *supra*.

[16] Art. 5.16(1)(b) del Código Electoral de 2020, *supra*. Debemos aclarar que, a pesar de que la última oración del Art. 5.16(2) del Código Electoral de 2020 establece una excepción para la revisión judicial del trámite dirigido a la recusación por domicilio del elector, el Código Electoral de 2020 no estableció el referido proceso tal como disponía el Art. 5.005 del Código Electoral para el Siglo XXI. Así, en el presente caso y ante el vacío en la ley, los foros *a quo* correctamente determinaron que el Presidente de la Comisión Estatal de Elecciones poseía autoridad apelativa para atender la apelación del Comisionado

Asimismo, el postulado enumera la información que debe contener la solicitud y la motivación para promover la causa de acción.[17] Ahora bien, de salida es menester establecer que la Comisión Estatal de Elecciones, como guardián del interés público en los procesos electorales y principal albacea del valor del voto de cada ciudadano, debe observar, además de los requisitos contenidos en el Art. 5.16, las garantías que emanan del debido proceso de ley, tanto en la modalidad sustantiva como en la procesal.[18]

En <u>Granados v. Rodríguez Estrada V</u>, 127 DPR 1, 35 (1990), indicamos que la recusación "goza de una naturaleza cuasijudicial que reconoce al elector recusado todas las garantías del debido proceso de ley". De hecho, la manera en que este trámite preeleccionario está delineado es "para garantizar que un elector no pueda ser arbitrariamente recusado por razón de cambio de domicilio".[19] Por ello, la determinación que haga el ente electoral está revestida de una presunción de regularidad y corrección al

---

Alterno del Partido Nuevo Progresista del Precinto 8 del Municipio de Cataño. Tal determinación es cónsona con que "[n]o podemos coartar el derecho de apelar de un ciudadano por razones que están totalmente fuera de su control". <u>Ríos Martínez, Com. Alt. PNP v. CLE</u>, 196 DPR 289, 306 (2016).

[17] Art. 5.16(2) del Código Electoral de 2020, <i>supra</i>. En vista de que la petición de recusación que atendemos se dirige a la que procura anular una petición de inscripción, excluir o inactivar a un elector del Registro, es decir la preeleccionaria, no abundaremos en otras implicaciones constitucionales que se afectan durante el proceso de recusación del voto que surge durante la celebración de un evento electoral.

[18] <u>PPD v. Admor. Gen. De Elecciones</u>, 11 DPR 199, 210 (1981).

[19] <u>Granados v. Rodríguez Estrada V</u>, 127 DPR 1, 34 (1990).

excluir a los electores conforme a las garantías establecidas en el procedimiento de recusación dispuesto en las normas de derecho electoral.[20]

Acorde con el Art. 5.16 del Código Electoral de 2020, *supra*, la recusación se inicia con la presentación de la solicitud juramentada en la Comisión Local del precinto que le corresponda al elector. Una vez recibida, el Presidente de la Comisión Local señalará una vista dentro de los 10 días siguientes. Tanto el elector recusado como el recusador deberán ser citados, también cualquier otra persona que las partes soliciten que sea citada y, el día de la vista, el Presidente de la Comisión Local oirá la prueba desfilada.

Según el diseño del proceso, serán notificados los Comisionados Locales de los distintos partidos políticos y los presidentes municipales de los comités políticos de los distintos partidos políticos. Conforme a este postulado, la validez de una solicitud de recusación está sujeta a un acuerdo unánime de los miembros de la Comisión Local, o en su ausencia, del Presidente de la Comisión Local, quien determinará finalmente si ésta procede. Ello, por supuesto, mediante prueba clara, robusta y convincente.[21] De hecho, ésta constituye la única ocasión en que el Presidente de la Comisión Local intervendría en una recusación. De proceder la recusación, el Presidente de la Comisión Local ordenará la exclusión del elector en el Registro.

---

[20] Íd.

[21] Art. 5.4 y 5.7 del Código Electoral de 2020, *supra*.

Las garantías del derecho a un debido proceso de ley en su vertiente procesal están plasmadas en el trámite en la medida en que un ente imparcial preside la vista, el recusado y el recusador tienen el derecho a ser oídos, a confrontar a los testigos y a examinar la prueba presentada.[22] Ante el efecto de que una petición de inscripción de un elector quede anulada o que éste sea excluido o inactivado del Registro, el debido proceso de ley obliga a que la CEE lleve a cabo un proceso que sea justo. Ciertamente, la consecuencia que acarrea esta causa de acción no puede ser tomada livianamente, pues constituye un ataque directo al derecho al voto, patrimonio para quien cumpla con los requisitos en ley.[23] Esto recae sobre la garantía constitucional que consagra la Sec. II del Art. 2 de la Constitución sobre el derecho al voto, igual, libre, directo y secreto.[24]

Ahora bien, y más directamente relacionado con la controversia que nos ocupa, la pregunta sería la siguiente: ¿cómo específicamente se pudieron haber afectado negativamente los derechos de los electores, de los partidos

---

[22] Ríos Martínez, Com. Alt. PNP v. CLE, *supra*.

[23] PPD v. Admor. Gen. De Elecciones, *supra*. Destacamos que el Art. 5.3 del Código Electoral de 2020, *supra*, establece los requisitos para ser elector en Puerto Rico de la manera siguiente:
> Será Elector de Puerto Rico todo ciudadano de Estados Unidos de América, domiciliado en Puerto Rico; que a la fecha de la votación haya cumplido los dieciocho (18) años de edad; esté debidamente calificado como activo con antelación a la misma conforme a esta Ley y sus reglamentos; y no se encuentre incapacitado mentalmente por sentencia de un Tribunal de justicia.

[24] Art. II, Sec. 2, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 283.

políticos y del interés público, al dejarse sin efecto el Acuerdo alcanzado legítimamente por los Comisionados? Veamos.

Es común que los comisionados electorales locales de los partidos políticos presenten solicitudes de recusación y que cada Comisionado Local de la colectividad o la franquicia afectada defienda a los electores que pretenden recusar, ello con el fin de procurar que éstos permanezcan en el Registro.[25] La función de los integrantes de la Comisión Local de señalar y corregir errores y omisiones en el Registro está intrínsecamente relacionada al trámite indispensable de la recusación, pues, **en primer lugar, mediante este mecanismo se protege la pureza del trámite electoral ya que salvaguarda el proceso contra inscripciones fraudulentas.**[26]

En ese sentido, y por ser representantes de los partidos políticos, la referida obligación de los comisionados locales permite canalizar el ejercicio de la voluntad electoral.[27] Ahora bien, la importancia de asegurar que las personas que consten inscritas en efecto residan en el lugar que identificaron como su domicilio, también afecta -ya sea positiva o negativamente- a cada candidato y, por ende, a los partidos políticos que éstos representan. La omisión de la recusación provoca que se diluya el voto de las personas con derecho a votar en determinado precinto, distrito o pueblo,

---

[25] Ríos Martínez, Com. Alt. PNP v. CLE, *supra* y Comisionado v. Presidenta, 166 DPR 513 (2005).

[26] Art. 4.4(2)(h) del Código Electoral de 2020, *supra*, P.S.P. v. Com. Estatal de Elecciones, 110 DPR 400, 437 (1980).

[27] McClintock v. Rivera Schatz, 171 DPR 584, 597 (2007).

pues su voto como elector *bona fide* se ve obligado a competir con el voto de aquel elector **que no tiene derecho a votar en ese precinto, distrito o pueblo**. Así, por ejemplo, cuando en una contienda por la alcaldía de un pueblo, veinte personas que no tenían derecho a votar en ese pueblo votan por un candidato en específico, diluyen o hacen inoficioso el voto de veinte electores bona fide que votaron por el candidato contrario y que, de haberse recusado a los primeros, le hubieran dado veinte votos de ventaja a su candidato, y hasta decidir la elección.

Por ello, cuando -como en este caso- no se le da paso a una solicitud de recusación presentada oportunamente, se quebranta el derecho del elector *bona fide*, de los candidatos y del partido político que presentó tal solicitud, a ser oídos por un ente imparcial y a presentar prueba contra la persona a ser recusada. Violentándose el derecho del candidato al puesto electivo y del partido político a presentar prueba robusta de recusación que le permita limpiar el registro electoral y, de esa forma, a ser elegido o rechazado mediante el voto directo del elector que verdaderamente esté domiciliado en el precinto correspondiente. Como secuela, se afecta además el valor o la efectividad del voto del elector *bona fide*. Todo esto, en clara violación al debido proceso de ley.

En fin, no poder promover la recusación, repercute en la pureza de la finalidad de los comicios y, por ende, en el

resultado final de la votación.[28] Además, es claro que todo lo anterior enmarca "un asunto de alto interés público pues concierne la corrección de las listas electorales y de este modo evitar un posible fraude".[29] Es decir, "[e]l interés del estado en [la exigencia del domicilio electoral] se basa en que debe prevenir el fraude y la votación múltiple; preservar la integridad de la comunidad donde se celebra la elección y excluir a los transeúntes; y que debe participar el electorado directamente concernido y afectado por la elección".[30]

**D. El principio de especialidad de la ley**

Este Foro ha reiterado que, en la interpretación de estatutos, es principio general el que una ley de carácter especial sobre la materia prevalece sobre una de carácter general. Es decir, la ley especial debe prevalecer sobre cualquier otro precepto que sea de carácter general. Dicho principio proviene del Art. 12 del Código Civil, 31 LPRA sec. 12, el cual establece que "[e]n las materias que se rijan por leyes especiales, la deficiencia de éstas se suplirá por las disposiciones de este título".

A tenor con este principio básico está claramente establecido que "[u]na ley general no deroga una especial, a menos que tal derogación se consigne expresamente". A su vez, "[c]uando hay dos leyes o disposiciones, de las cuales

---

[28] PPD v. Admor. Gen. de Elecciones, *supra*, pág. 236 esc. 28.

[29] Ríos Martínez, Com. Alt. PNP v. CLE, *supra*, pág. 306.

[30] PPD v. Admor. Gen. de Elecciones, *supra*, pág. 258.

una es especial y particular e incluye ciertamente la materia en controversia, y la otra tan general que de subsistir sola incluiría la misma materia, y vendría en conflicto con la ley o disposición especial, **debe entenderse que la especial constituye una excepción a la ley o disposición general, especialmente cuando la ley general y la especial son contemporáneas, pues no se presume que la Asamblea Legislativa intentó crear un conflicto".[31]**

En el caso de PSP, PPD, PIP v. Romero Barceló, 110 DPR 248 (1980), tuvimos la oportunidad de resolver sobre la procedencia de un procedimiento especial de votación estatuido en la Ley Núm. 3 de septiembre de 1980 (Ley Núm. 3). En particular y distinto a la Ley Electoral, la Ley Núm. 3 permitía el ejercicio al voto sin requerir la presentación de la tarjeta de identificación electoral. Nótese que la Ley Núm. 3 fue aprobada con el propósito de atender y remediar la situación particular de que un gran número de electores inscritos no tenían disponible la tarjeta electoral y, consecuentemente, ello provocaría que éstos -a pesar de estar inscritos- no pudieran ejercer su derecho al voto.

En lo pertinente, allí validamos la Ley Núm. 3 y expresamos que "**[l]a Ley Electoral, aunque de evidente naturaleza especial constituye la legislación básica, de carácter y aplicación general en todo lo concerniente a los**

---

[31] Ex parte Ramos, 53 DPR 374 (1938). (Énfasis suplido).

**procesos electorales**. [32]  (Énfasis suplido). Así, añadimos que "no se trata sino de un irreconciliable conflicto entre las disposiciones de una ley especial -la Ley Núm. 3- y una de carácter general -la Ley Electoral-. **En tal situación, las disposiciones de la ley especial deben prevalecer**.[33] (Énfasis suplido).

## III

Como establecimos, es un principio básico de hermenéutica que la ley especial sobre determinada materia prevalecerá sobre un estatuto general, y en los asuntos electorales no es la excepción.[34] Aunque de ordinario las resoluciones conjuntas se utilizan para asuntos presupuestarios y fiscales,[35] este mecanismo ha sido utilizado para complementar los trámites electorales en determinados comicios.[36] Cónsono con lo anterior, es sabido que las resoluciones conjuntas deben ser interpretadas conforme a los mismos principios que rigen en materia de interpretación de las leyes ordinarias porque, advertimos que,  su única diferencia es en cuanto a la temporalidad o

---

[32] PSP, PPD, PIP v. Romero Barceló, *supra*, pág.263, citando a Rivera de Vicenti v. Colón, 103 DPR 560, 561 (1975).

[33] Íd.

[34] PSP, PPD, PIP v. Romero Barceló, 110 DPR 248, 262 (1980).

[35] Véanse, por ejemplo Aponte Hernández v. Riera, 175 DPR 256 (2009) (Sentencia) (Opinión de conformidad de la Juez Asociada señora Rodríguez Rodríguez); Domínguez Castro v. ELA, 178 DPR 1 (2010).

[36] Véanse, PPSP, PPD, PIP v. Romero Barceló, *supra*, P.S.P. v. Com. Estatal de Elecciones, 110 DPR 400, 420 (1980), Santini Guadier v. CEE, 185 DPR 522, 531 (2012) (Sentencia).

efecto limitado.[37]    Así pues, el principio general de especialidad permea la controversia ante nuestra consideración. Ciertamente, como ley especial, la fuerza estatutaria que una Resolución Conjunta le imprima a una legislación de carácter y aplicación general no está sujeta al orden cronológico de su aprobación, sino a la intención legislativa por la cual se creó.

En ese sentido, el Código Electoral de 2020 es realmente una legislación básica, de carácter y aplicación general en todo lo concerniente a los procesos electorales.[38]   Como ya hemos establecido, aunque un código electoral atiende los trámites y asuntos electorales nada impide la aprobación de legislación que, a pesar de que no enmiende el ordenamiento jurídico electoral, atienda asuntos particulares o especiales concernientes a la referida materia.[39] **En conclusión, al evaluar el Código Electoral de 2020 y la Resolución Conjunta 37, ésta última constituye la ley especial y el Código Electoral de 2020 opera como una ley de carácter más general que la primera. Por lo tanto, no puede predominar el principio de orden cronológico, sino el principio hermenéutico de ley especial sobre la general.** La Resolución Conjunta 37 como legislación especial facultó a los Comisionados Electorales para aprobar el Acuerdo al que llegaron, y éste está

---

[37] Véase, Op. Sec. Just. Núm. 12 de 1988.

[38] PSP, PPD, PIP v. Romero Barceló, supra, pág. 262. Véase, además, Santini Guadier v. CEE, 185 DPR 522, 531 (2012) (Sentencia).

[39] PSP, PPD, PIP v. Romero Barceló, supra.

vigente para todos los asuntos que aplique y con todo vigor, en estas elecciones de 2020.

Habiendo resuelto lo anterior, y ante los derechos electorales envueltos en este caso, solo nos resta añadir lo siguiente. Las determinaciones de los foros *a quo* fallaron en discernir que este no era el típico caso en que un acuerdo aparentemente chocaba con el texto previo de una ley, sino todo lo contrario; una ley que aparentemente chocaba con el texto previo de un acuerdo, adoptado en virtud de la normativa especial que regula la controversia ante nos. Ese acuerdo, para colmo, respondía al mandato expreso de la Asamblea Legislativa. Como intimamos al inicio, tal circunstancia debió llamar la atención de los foros *a quo* ante la posible violación de derechos electorales envueltos, y que indefectiblemente fueron soslayados con su determinación. Como bien señaló el Presidente de la CEE, los comisionados locales de los partidos ajustaron sus calendarios de trabajo descansando en un Acuerdo legítimamente aprobado.

**IV**

Por los fundamentos antes expuestos, se expide el auto de certiorari presentado y se revocan las Sentencias emitidas por los foros *a quo* y resolvemos que **el Acuerdo de los Comisionados Electorales es válido, por lo que la fecha límite para presentar las recusaciones era el 11 de julio de 2020 y no el 30 de junio de 2020.** En consecuencia,

concluimos que el Comisionado Electoral Alterno del Partido Nuevo Progresista (PNP) del Precinto 8 del Municipio de Cataño promovió oportunamente la causa de acción de recusación.

Se dictará sentencia de conformidad.


                              Erick V. Kolthoff Caraballo
                                   Juez Asociado

**EN EL TRIBUNAL SUPREMO DE PUERTO RICO**

| | |
|---|---|
| Nicolás Gautier Vega, en su Capacidad Oficial como Comisionado Electoral del Partido Popular Democrático y otros<br><br>Recurridos<br><br>v.<br><br>Héctor Joaquín Sánchez, en su Capacidad Oficial como Comisionado Electoral del Partido Nuevo Progresista<br><br>Peticionario | **CC-2020-0376** |

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de octubre de 2020.

Por los fundamentos antes expuestos, se expide el auto de certiorari presentado y se revocan las Sentencias emitidas por los foros *a quo* y resolvemos que **el Acuerdo de los Comisionados Electorales es válido, por lo que la fecha límite para presentar las recusaciones era el 11 de julio de 2020 y no el 30 de junio de 2020.** En consecuencia, concluimos que el Comisionado Electoral Alterno del Partido Nuevo Progresista (PNP) del Precinto 8 del Municipio de Cataño promovió oportunamente la causa de acción de recusación.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez disiente con opinión. El Juez Asociado señor Colón Pérez disiente con opinión a la cual se une la Juez Asociada señora Rodríguez Rodríguez.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Nicolás Gautier Vega, en su Capacidad Oficial como Comisionado Electoral del Partido Popular Democrático y otros<br><br>Recurridos<br><br>v.<br><br>Héctor Joaquín Sánchez, en su Capacidad Oficial como Comisionado Electoral del Partido Nuevo Progresista<br><br>Peticionario | CC-2020-0376 | *Certiorari* |
|---|---|---|

La Jueza Presidenta ORONOZ RODRIGUEZ emitió una Opinión disidente.

En San Juan, Puerto Rico, a 13 de octubre de 2020.

Una mayoría de este Tribunal decidió que una determinación que tomaron cinco comisionados de la Comisión Estatal de Elecciones (CEE) impera sobre una legislación posterior que atendió específicamente el mismo asunto para disponer algo distinto. A base de ese raciocinio, una mayoría de esta Curia resuelve que el término que la CEE estableció para presentar acciones de recusaciones de electores en las elecciones generales del año en curso -lo cual hizo al amparo de la facultad general que le confirió una Resolución Conjunta- prevalece sobre el término que el Código Electoral de 2020, <u>infra</u>, estableció posteriormente **específicamente** para esos comicios.

El criterio mayoritario se fundamenta en que el mandato expreso y específico que se legisló en el Código Electoral de 2020, infra, no puede tener el efecto de modificar la facultad que recién se le había otorgado a la CEE en virtud de la Resolución Conjunta Núm. 37-2020, infra. Esto, pues entiende que, debido a que el Código Electoral de 2020, infra, no derogó expresamente la resolución conjunta en controversia, lo que correspondía era tratar, tanto la Resolución Conjunta Núm. 37-2020 como cada determinación que hiciera la CEE al amparo de esta, como leyes especiales que prevalecen en su totalidad sobre el Código Electoral de 2020, infra. No estoy de acuerdo con ese análisis.

Contrario a lo que intima la Mayoría sobre el carácter especial de la Resolución Conjunta Núm. 37-2020, infra, en este caso la CEE actuó al amparo de una facultad general que se le concedió para extender ciertas fechas del calendario electoral relacionadas con los comicios primaristas. En contraste, el Código Electoral de 2020, infra, aprobado posteriormente, contiene **un mandato claro y expreso del legislador sobre la fecha límite para presentar las recusaciones de electores durante las elecciones generales de este año.** Ante la naturaleza expresa y específica de esa intención legislativa posterior, esta prevalece sobre una de carácter general que la contradiga. Toda vez que, a raíz de la aprobación del Código Electoral de 2020, infra, el

acuerdo de la CEE entró en conflicto con lo que el legislador plasmó de manera expresa y específica en el Código Electoral de 2020, infra, esta perdió su carácter vinculante. Como la Mayoría no reconoce lo anterior, disiento.

I

El Art. 8.009 del Código Electoral para el Siglo XXI, Ley Núm. 78-2011, ahora derogado (Código Electoral anterior), establecía que la CEE debía celebrar los comicios primaristas el primer domingo del mes de junio del año en que se celebraran las elecciones generales. A tenor de ello, la fecha para celebrar las primarias sería el 7 de junio del 2020. Asimismo, el Art. 6.018 de ese cuerpo normativo disponía que el periodo para promover cualquier acción de recusación de electores sería entre "el 15 de enero y el 30 de abril del año de las Elecciones Generales". Art. 6.018, Código Electoral para el Siglo XXI, Ley Núm. 78-2011, derogado. Sin embargo, ante el estado de emergencia que creó la propagación del COVID-19, la Gobernadora de Puerto Rico, Hon. Wanda Vázquez Garced, puso en vigor —mediante la Orden Ejecutiva OE-2020-0020 y sus enmiendas— una serie de medidas preventivas que incluyeron el cierre total de las operaciones gubernamentales. Aunque esas medidas se flexibilizaron posteriormente, el calendario electoral conducente al evento primarista sufrió dilaciones significativas. Entre estas, la fecha límite para

presentar acciones de recusación de electores — entiéndase, el 30 de abril de 2020— transcurrió sin que se pudiera habilitar ese mecanismo que proveía el Código Electoral anterior.

En vista de ello, el 4 de junio de 2020 la Asamblea Legislativa aprobó la Resolución Conjunta Núm. 37-2020 sobre la R. C. del S. 556 (Resolución Conjunta 37-2020), con vigencia inmediata después de su aprobación. En su Exposición de Motivos se especificó que la situación de emergencia incidía "directamente en el calendario electoral previo a las primarias". Exposición de Motivos, Resolución Conjunta 37-2020, supra. Adicionalmente, se indicó que, "debido a la suspensión de las labores en la Comisión Estatal de Elecciones, no se han podido poner en marcha los preparativos que anteceden dicho evento electoral". Íd. Sobre el propósito específico de la Resolución Conjunta 37-2020, el legislador expresó:

> La Asamblea Legislativa entiende que, debido al estado de emergencia de salud pública que enfrenta Puerto Rico en estos momentos, es imperativo tomar la decisión de posponer la celebración de las primarias de los partidos políticos, señalada para el domingo 7 de junio de 2020. Anticipando que la preparación para el evento primarista se ha atrasado por cerca de dos (2) meses, entendemos prudente posponer las primarias hasta el domingo, 9 de agosto de 2020. Además, mediante esta Resolución Conjunta, se proveen los mecanismos necesarios para poder llevar a cabo de manera segura, en cumplimiento con las nuevas normas de distanciamiento social requeridas a raíz de la pandemia y garantizando el derecho de cada ciudadano a ejercer el voto libre y voluntariamente. Íd.

Además de posponer la fecha del evento primarista, la Resolución Conjunta 37-2020 dispuso que la CEE "revisará y ajustará el calendario electoral **para las primarias**, con el fin de que se ajuste a la fecha dispuesta en esta Resolución Conjunta para la celebración de la primaria". Sec. 2, Resolución Conjunta 37-2020, supra. En esa misma sección, al final de una lista de ocho trámites específicos para los cuales se impuso una fecha límite cierta y específica, la Asamblea Legislativa dispuso:

> Cualquier otro trámite cuya fecha establecida en el calendario electoral que haya vencido durante el periodo comprendido entre el 16 de marzo de 2020 y la fecha de la aprobación de esta Resolución Conjunta, será extendido por la Comisión en el calendario electoral revisado según las disposiciones de esta Sección. Íd.

Se dispuso además que, para fines de la Resolución Conjunta 37-2020, supra, "cualquier referencia al Código Electoral significará el 'Código Electoral de Puerto Rico para el Siglo XXI', Ley 78-2011, según enmendada, o cualquier ley análoga que lo sustituya". Sec. 11, Resolución Conjunta 37-2020, supra.

Ahora bien, al amparo del Código Electoral anterior, el término para presentar las acciones por recusaciones por domicilio vencía el 30 de abril del año eleccionario. Lo anterior para efectos tanto de las primarias como de las elecciones generales. Sobre las recusaciones, la Resolución Conjunta 37-2020, supra, dispuso únicamente

que la CEE tenía hasta el 15 de julio de 2020 para publicar los nombres de las personas recusadas. Sec. 2(8), Resolución Conjunta 37-2020, supra. No se incluyó disposición alguna sobre el nuevo periodo para presentar recusaciones. En virtud de ese silencio legislativo, y al amparo de la facultad que le delegó la Asamblea Legislativa mediante la Resolución Conjunta 37-2020, supra, el 11 de junio de 2020 la CEE aprobó unánimemente el Acuerdo de Comisión CEE-AC-20-150 (Acuerdo). En este último, se estableció que el término para presentar las recusaciones sería desde el 11 de junio hasta el 11 de julio de 2020.

No obstante, el 20 de junio de 2020, la Asamblea Legislativa aprobó el Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020 (Código Electoral de 2020), con vigencia inmediata desde su aprobación. Allí se especificó en el Art. 4.5 que las "recusaciones contra Electores solo se presentarán, procesarán, evaluarán y adjudicarán siguiendo rigurosamente las reglas y los procedimientos dispuestos en los Artículos 5.16, 5.17 y 5.18 de [esa] Ley". Art. 4.5, Código Electoral, supra. En lo pertinente, el Art. 5.17 dispuso:

> Cualquier Elector del precinto correspondiente al recusado podrá promover cualquier acción de recusación por los mismos fundamentos del Artículo 5.16 de esta Ley dentro de un periodo de tres (3) meses y quince (15) días comprendidos entre el 15 de enero y el 30 de abril del año de las Elecciones Generales. **Disponiéndose que, para propósitos de las Elecciones Generales de 2020, el periodo de**

**recusaciones culminará el 30 de junio de 2020.**
Art. 5.17, Código Electoral, <u>supra</u>. (Énfasis
suplido).

II

En concordancia con la Resolución Conjunta 37-2020,
<u>supra</u>, la facultad que se le otorgó a la CEE para ajustar
el calendario electoral se limitaba a lo dispuesto allí y
para los propósitos exclusivos que se delegaron allí; es
decir, para los preparativos de los comicios primaristas.
De ninguna forma se le otorgó a la CEE la autoridad para
tomar determinaciones en asuntos electorales ajenos a las
facultades que le delegó la Asamblea Legislativa al
aprobar la Resolución Conjunta 37-2020, <u>supra</u>, y el
Código Electoral anterior, que era el vigente en ese
momento. En atención a ello, aun cuando el legislador le
delegó a la CEE la facultad para extender ciertas fechas
del calendario electoral para la celebración de las
primarias, esa facultad no podía tener el efecto de
abrogar las prerrogativas inherentes del legislador que
posee por virtud del principio de separación de poderes
que consagra nuestra Constitución. En conformidad con
estas, el legislador tiene el poder inherente de legislar
para eliminar o modificar, de forma expresa o tácita, las
facultades que le concedió a una agencia.

El Acuerdo de Comisión CEE-AC-20-150 que se hizo al
amparo de la Sección 2 de la Resolución Conjunta 37-2020,
<u>supra</u>, imperaba en tanto y en cuanto la Asamblea
Legislativa no aprobara legislación posterior que fuera

contraria a lo que allí se acordó. Ciertamente, la CEE actuó conforme a la facultad que se le delegó cuando el 11 de junio de 2020 estableció un nuevo término en el que se presentarían las recusaciones. Podía hacerlo pues: (1) el término final original que constaba en el Código Electoral anterior, supra, había vencido el 30 de abril de 2020, y (2) en la Resolución Conjunta 37-2020, supra, no se estableció un término para ello. Como vimos, esa Resolución Conjunta 37-2020, supra, le permitía a la CEE extender ese término pues fue uno de los que venció durante el tiempo que expuso en su Sección 2. No obstante, una vez el legislador dispuso en una ley posterior —entiéndase el Código Electoral de 2020, supra— que, **para propósitos de las elecciones generales de 2020, el periodo de recusaciones culminaría el 30 de junio de 2020**, este ejerció la facultad inherente a su cargo para establecer una fecha cierta. Véase Art. 5.17, Código Electoral de 2020, supra. Distinto al acuerdo que la CEE otorgó, esa actuación constituyó la intención legislativa específica más reciente sobre el particular.

Contrario al criterio mayoritario, en este caso el legislador, al establecer un término cierto para las recusaciones luego de aprobar la Resolución Conjunta 37-2020, supra, modificó un asunto inherente a su prerrogativa legislativa. Al hacerlo así, era imposible que, desde ese momento, imperara la vigencia de un acuerdo que estaba en clara contravención con la

intención expresa del legislador. Máxime cuando el Código Electoral de 2020, supra, se firmó dieciséis días después de aprobarse la Resolución Conjunta 37-2020, supra, y nueve días después de aprobarse el Acuerdo que otorgó la CEE. Intimar lo contrario es concluir que la fecha cierta del 30 de junio de 2020 que instituyó el legislador como término límite para presentar las recusaciones — **específicamente para las elecciones generales del 2020**— se incluyó sin propósito alguno. Esa interpretación es absurda.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Nicolás Gautier Vega en su
Capacidad Oficial como
Comisionado Electoral del
Partido Popular Democrático
y otros

　　　　　　　　　　　　　　　CC-2020-0376　　　*Certiorari*

　　　　Recurridos

　　　　　v.

Héctor Joaquín Sánchez
en su Capacidad Oficial como
Comisionado Electoral del
Partido Nuevo Progresista

　　　　Peticionario

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ a la
que se une la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ.

En San Juan, Puerto Rico a 13 de octubre de 2020.

En el día de hoy, -- en un verdadero acto de malabarismo jurídico -- una mayoría de los miembros de este Tribunal invierte el orden de jerarquía de las fuentes del Derecho que tradicionalmente ha imperado en nuestro ordenamiento jurídico, para -- por encima de la ley -- conferirle primacía a determinado Acuerdo otorgado por la Comisión Estatal de Elecciones y los Comisionados Electorales de los distintos partidos políticos. Dicho orden jerárquico -- históricamente -- ha sido piedra angular en el quehacer jurídico, por lo cual, la decisión que emiten mis compañeros y compañeras de estrado no solo es insostenible en derecho, sino que quebranta los

preceptos más básicos de las reglas de interpretación jurídica que guían nuestro oficio.

Así las cosas, con su proceder, y a pedidos del Comisionado Electoral del Partido Nuevo Progresista, señor Héctor Joaquín Sánchez Álvarez, la mayoría de los miembros de esta Curia permite que la Comisión Estatal de Elecciones -- una vez más -- opere al margen de la ley; esta vez dando paso a la presentación de un sinnúmero de solicitudes de recusación por domicilio que, en el Municipio de Cataño, se presentaron fuera del término contemplado para ello por el Código Electoral de 2020, *infra*. Lo anterior, pasando por alto lo correctamente decidido por el Juez que preside la Comisión Local de Elecciones en el referido Municipio, por el Tribunal de Primera Instancia y por el Tribunal de Apelaciones.

En momentos en que nuestro País -- lastimado por la celebración de un evento primarista altamente accidentado -- exige la mayor pureza posible en los procesos eleccionarios que se avecinan, invitaciones como las que hoy nos hace el Comisionado Electoral del Partido Nuevo Progresista son contrarias a los más elementales principios constitucionales, legales y reglamentarios que custodian el derecho al voto de todos los puertorriqueños y puertorriqueñas, sobre los cuales se erige nuestro sistema democrático de gobierno. De ahí, la obligación de disentir una vez más. Veamos.

I.

Allá para el 4 de junio de 2020 -- y con anterioridad a la aprobación del actual Código Electoral de 2020, *infra*, el 20 de junio de ese año -- la Asamblea Legislativa aprobó la Resolución Conjunta 37-2020, R. C. del S. 556 de 4 de junio de 2020 (en adelante, "Resolución Conjunta Núm. 37-2020"), con vigencia inmediata, a los fines de posponer la fecha para realizar los eventos primaristas en el País, que se debían celebrar en el verano de 2020, y cuyos preparativos se habían atrasado debido a la pandemia del COVID-19. A esos fines, la referida Resolución Conjunta estableció el 9 de agosto de 2020 como el día en el que se llevaría a cabo el mencionado evento electoral.

Asimismo, en su sección 2, la Resolución Conjunta objeto de estudio, facultó a la Comisión Estatal de Elecciones a revisar y ajustar el calendario electoral para el mencionado evento. En lo pertinente, se dispuso que "[c]ualquier otro trámite cuya fecha establecida en el calendario electoral, que haya vencido durante el periodo comprendido entre el 16 de marzo de 2020 y la fecha de aprobación de esta Resolución Conjunta, será extendido por la Comisión en el calendario electoral revisado según las disposiciones de esta Sección". Resolución Conjunta Núm. 37-2020.

Conforme a la anterior facultad, el 11 de junio de 2020 el entonces presidente de la Comisión Estatal de Elecciones,

Lcdo. Juan Ernesto Dávila Rivera, y los Comisionados Electorales de los distintos partidos aprobaron, de forma unánime, el Acuerdo CEE-AC-20-150. Allí, se determinó que el periodo de recusaciones transcurriría desde el 11 de junio hasta el 11 de julio de 2020.[40]

Así las cosas, el **8 de julio de 2020** el Comisionado Local Alterno del Partido Nuevo Progresista (en adelante, "PNP"), señor Isaías Medina Morales (en adelante, "señor Medina Morales") presentó un sinnúmero de solicitudes de recusación por domicilio ante la Comisión Local del Precinto 008 en el Municipio de Cataño. Enterado de lo anterior, el Comisionado Local del Partido Popular Democrático (en adelante, "PPD") presentó una moción de desestimación en la que sostuvo que el término para presentar recusaciones había vencido, pues ya estaba en vigor el actual Código Electoral de 2020, *infra*, el cual instituyó el **30 de junio de 2020** como la fecha límite para culminar el referido proceso.

Evaluados los argumentos de ambos Comisionados Electorales Locales, el Presidente de la Comisión Local de Elecciones, Hon. Rafael J. Parés Quiñones, denegó expedir las citaciones por edicto para las recusaciones por domicilio presentadas por el señor Medina Morales. Para fundamentar su decisión, razonó que, conforme a lo dispuesto en el Art. 5.17

---

[40] Conforme a lo dispuesto en el Art. 6.018 de la ahora derogada Ley Núm. 78 de 1 de junio de 2011, conocida como Código Electoral de Puerto Rico para el Siglo XX, 16 LPRA secc. 4001, cualquier acción en solicitud de recusación de electores o electoras se llevaría a cabo entre el 15 de enero y el 30 de abril del 2020.

del Código Electoral de 2020, *infra*, el periodo para presentar solicitudes de recusaciones había culminado el 30 de junio de 2020.

Insatisfecho con la anterior determinación, el señor Medina Morales -- en su capacidad oficial como Comisionado Local Alterno del PNP -- presentó un recurso de apelación ante la Comisión Estatal de Elecciones, el cual fue atendido el 23 de julio de 2020 en la reunión de pleno de dicha Comisión. Ante la falta de unanimidad por parte de los Comisionados Electorales, el entonces presidente de la referida agencia gubernamental, Lcdo. Juan Ernesto Dávila Rivera, emitió una *Resolución* en la que sostuvo que la fecha límite para presentar recusaciones por domicilio lo era el 11 de julio de 2020, ello conforme al Acuerdo CEE-AC-20-150. Véase, *In re: Apelación Cataño 08 Sobre Recusaciones por Domicilio*, CEE-RS-20-142.

En desacuerdo con lo dictaminado, el 31 de julio de 2020, y al amparo del Art. 13.2 del Código Electoral de 2020, *infra*, el entonces Comisionado Electoral del PPD, Lcdo. Lind O. Merle Feliciano, presentó un recurso de revisión judicial ante el Tribunal de Primera Instancia. Dicho foro, por voz del Hon. Anthony Cuevas Ramos, dictó una *Sentencia* en la que -- por entender que el periodo de recusaciones culminó el 30 de junio de 2020 -- revocó, en parte, la *Resolución* de la Comisión Estatal de Elecciones. Ahora bien, confirmó parte de la *Resolución* de la mencionada agencia gubernamental, tras

razonar que ésta sí poseía jurisdicción para atender la apelación de la determinación de la Comisión Local.

Inconforme con dicho proceder, el entonces presidente de la Comisión Estatal de Elecciones, Lcdo. Juan Ernesto Dávila Rivera, acudió ante el Tribunal de Apelaciones. Una vez examinados los planteamientos de éste, el foro apelativo intermedio (en un panel compuesto por los jueces Colom García, Ramos Torres y Soroeta Kodesh) confirmó la determinación del Tribunal de Primera Instancia. Ello, por entender que el Acuerdo aquí en controversia se mantuvo vigente hasta que entró en vigor el Código Electoral de 2020, *infra*. Lo anterior, pues, en la referida disposición legal, el Legislador -- de forma clara e inequívoca -- estableció un nuevo término para las recusaciones de este año eleccionario, entiéndase el 30 de junio de 2020.

Aún insatisfecho, el Comisionado Electoral del PNP, el señor Héctor Joaquín Sánchez Álvarez (en adelante, "señor Sánchez Álvarez") acude ante nos mediante petición de *certiorari*. En su recurso, arguye que la aprobación del Código Electoral de 2020, *infra*, no derogó la Resolución Conjunta Núm. 37-2020 que dio paso al Acuerdo otorgado por la Comisión y los Comisionados Electorales, pues el Legislador no lo dispuso expresamente, por lo que las recusaciones fueron presentadas a tiempo. De igual modo, sostiene que invalidar la Resolución Conjunta y el Acuerdo tendría el efecto de anular la fecha de las primarias ya celebradas, del

voto adelantando y del voto ausente, que fueron contempladas en la mencionada pieza legislativa. A dicha solicitud, el Comisionado del PPD, Lcdo. Nicolás Gautier Vega (en adelante, "licenciado Gautier Vega"), se opuso.

En su alegato, el licenciado Gautier Vega, argumenta que la Asamblea Legislativa conocía sobre el alcance de la Resolución Conjunta Núm. 37-2020 y el Acuerdo CEE-AC-20-150 y aun así optaron por cambiar el estado de derecho al aprobar el nuevo Código Electoral de 2020, *infra*. Además, sostiene que no se trata de una contradicción entre la Resolución Conjunta **-- la cual no dispuso una fecha específica para el periodo de recusaciones --** y el Art. 5.17 del Código Electoral de 2020, *infra*, sino entre este último y el Acuerdo otorgado por los Comisionados Electorales de los partidos políticos.

Posteriormente, el ahora presidente de la Comisión Estatal de Elecciones, Hon. Francisco Rosado Colomer, comparece ante este foro y plantea que el propósito por el cual se adoptó la discutida Resolución aún no se ha cumplido, ya que continuamos en medio de la emergencia ocasionada por la pandemia, por lo que no procede que la invalidemos. Asimismo, expresa que por estar en juego el derecho al voto y la pureza de los eventos electorales, este Tribunal debe establecer límites apropiados a la potestad de legislar para cambiar trámites electorales una vez hayan comenzado.

Trabada así la controversia, y con el beneficio de la comparecencia de todas las partes con interés en el litigio, procedemos a exponer la normativa aplicable a la misma.

II.

A.

El Art. II, Sec. 2, de la Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho al voto, para toda persona domiciliada en el País, como uno de los valores constitucionales de más alta jerarquía. Ello, al disponer que las leyes adoptadas por la Asamblea Legislativa "garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". CONST. ELA art. II, § 2, LPRA, Tomo 1.

En ese sentido, los legisladores y legisladoras -- al igual que todos los funcionarios y funcionarias que tengan a su cargo la dirección y organización de los eventos electorales que se celebren en Puerto Rico -- tienen una responsabilidad constitucional doble. *Aponte Rosario et al. v. Presidente de la Comisión Estatal de Elecciones*, MD-2020-002 cos. MD-2020-005, 2020 TSPR ___ (Colón Pérez, opinión disidente). Por una parte, éstos tienen que abstenerse de interferir con el ejercicio del sufragio universal, igual, directo y secreto y, de otro lado, tienen el deber afirmativo de proteger a los ciudadanos y ciudadanas contra toda

coacción en el ejercicio de tal derecho. *PPD v. Gobernador I*, 139 DPR 643, 670 (1995). Véase, también, *Sánchez y Colon v. ELA I*, 134 DPR 445, 448-49 (1993). Lo anterior, ya que, por ser el derecho al voto el pilar en el cual se cimenta nuestro sistema democrático, "es nuestra obligación hacerlo observar y respetar". *PPD v. Admor. Gen. de Elecciones*, 111 DPR 199, 221 (1981).

De otra parte, el Art. VI, Sec. 4, de nuestra Carta Magna establece que se dispondrá por ley lo relativo al proceso electoral y de inscripción de electores, al igual que lo concerniente a los partidos políticos y candidaturas. CONST. ELA art. VI, § 4, LPRA, Tomo 1. A tono con lo anterior, "[l]a Asamblea Legislativa tiene la facultad y la obligación de aprobar aquella reglamentación que, sin obstaculizar innecesariamente el derecho al voto en todas sus dimensiones, propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto e íntegro". *P.A.C. v. ELA*, 150 DPR 359 (2000); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 DPR 248 (1980); *P.S.P. v. Com. Estatal de Elecciones*, 110 DPR 400 (1980); *P.N.P. v. Tribunal Electoral*, 104 DPR 741 (1976).

Así pues, históricamente se han adoptado varios mecanismos para cumplir con la antes mencionada obligación, entre ellos el procedimiento de recusación. A través de dicho procedimiento, se permite impugnar el estado de un elector o electora en el Registro General de Electores con el propósito

de anular una petición de inscripción o, excluir o inactivar a éste o ésta del mencionado Registro. Art. 2.3 del Código Electoral de 2020, 2020 LPR 58. Asimismo, mediante la recusación se puede objetar el voto de un elector o electora en una elección cuando hubiere motivos fundados para creer que la persona que se presenta a votar lo hace ilegalmente. *Íd.*

Ahora bien, bajo dicho proceso solo se presentarán, evaluarán y adjudicarán solicitudes de recusación siguiendo rigurosamente las reglas y procedimientos dispuestos en los Arts. 5.16, 5.17 y 5.18 del referido cuerpo de ley. Art. 4.5, Código Electoral de 2020, *supra*. Sobre el particular, el inciso (1) del Art. 5.16, *supra*, esboza los fundamentos para dichas solicitudes. En lo pertinente al caso que nos ocupa, la precitada disposición contempla que podrán presentarse recusaciones ante la Comisión Local del precinto donde figura la inscripción del elector o electoral si éste o ésta "[n]o está domiciliado en la dirección descrita en su solicitud a la fecha de inscripción o en el momento de la recusación".[41] *Íd.*

En esa dirección, este Tribunal ha expresado que la recusación constituye un entredicho contra la validez del voto pues, si bien no lo anula inmediatamente se presente la solicitud, su propósito es precisamente ese. *PPD v. Admor.*

---

[41] Para una discusión abarcadora sobre el procedimiento de las recusaciones por domicilios, a la luz del Código Electoral anterior, véase *Ríos Martínez, Com. Alt PNP v. CLE*, 196 DPR 289, (2016) (Colón Pérez, opinión disidente).

*Gen. de Elecciones*, 111 DPR 199, 207 (1981). Cónsono con ello, existen varios criterios que deben aplicarse al analizar la procedencia del mecanismo de las recusaciones, tales como la presunción de la validez del voto emitido, así como que toda recusación cumplirá estrictamente con los requisitos que imponga la ley. *PPD v. Admor. Gen. de Elecciones, supra.* Véase también, *PPD v. Comisión Local*, 174 DPR 940 (2008) (Rodríguez Rodríguez, opinión disidente). Estos criterios deben estar "[e]nmarcados en el principio de que el derecho al voto es la más preciada de las prerrogativas del pueblo, porque es a través del voto que el pueblo ejerce su poder soberano y expresa su voluntad". *PPD v. Admor. Gen. de Elecciones, supra*, pág. 207. Véase, además, *Ramírez de Ferrer v. Mari Brás*, 144 DPR 141 (1997).

En cuanto a ello, debido a lo irregular que ha sido este año eleccionario y el atraso que sufrieron los eventos primaristas del verano de 2020, el Art. 5.17 del Código Electoral de 2020, *supra*, contempla dos fechas distintas para culminar el periodo de recusaciones. Al respecto, el mencionado cuerpo legal establece que:

> Cualquier elector del precinto correspondiente al recusado podrá promover cualquier acción de recusación por los mismos fundamentos del Artículo 5.16 de esta Ley dentro de un período de tres (3) meses y quince (15) días comprendidos entre el 15 de enero y el 30 de abril del año de las Elecciones Generales. **Disponiéndose que, para propósitos de las Elecciones Generales de 2020, el periodo de recusaciones culminará el 30 de junio de 2020.** (Énfasis suplido). Art. 5.17, Código Electoral de 2020, 2020 LPR 58.

Es decir, el Legislador -- consciente de que el proceso de recusaciones no se pudo realizar a tiempo, entiéndase el 30 de abril de 2020 según lo contemplaba el Código Electoral anterior, *supra* --, clara y expresamente, extendió el término de recusaciones aplicable a este año eleccionario hasta el 30 de junio de 2020. Sin embargo, instituyó, a su vez, el periodo en el que culminará dicho proceso para las elecciones de los cuatrienios subsiguientes. Presumimos que, todo lo anterior, lo realizó con conocimiento de lo dispuesto en la Resolución Conjunta aquí en controversia.

B.

Establecido lo anterior, conviene señalar aquí que el Art. 3.8 del referido Código, enumera las facultades y deberes del Presidente de la Comisión Estatal de Elecciones. Art. 3.8, 2020 LPR 58. De esa manera, el precitado artículo dispone que el Presidente será la máxima autoridad ejecutiva y administrativa de la Comisión cuya responsabilidad es supervisar los servicios, procesos y eventos electorales en un ambiente de absoluta pureza e imparcialidad. Art. 3.8, 2020 LPR 58.

**Para desempeñar dicha encomienda, el Presidente tendrá, entre otros, el deber de cumplir y hacer cumplir las disposiciones y los propósitos del Código Electoral de 2020, *supra*, la Constitución del Estado Libre Asociado de Puerto Rico y de Estados Unidos de América.** *Íd*. Igualmente, debe velar por el cumplimiento de las leyes que ordenen o

instrumenten cualquier tipo de proceso electoral o votación y de los reglamentos electorales que, por virtud de ley, sean aprobados por la Comisión, así como los acuerdos unánimes de los Comisionados Electorales. *Íd.*

De manera análoga, el Art. 4.4 del mencionado Código Electoral de 2020, *supra*, le impone ciertos deberes a las Comisiones Locales y su Presidente. Conforme a ello, el Presidente de la Comisión Local -- como representante del interés público, en estos casos un juez de la Rama Judicial de Puerto Rico -- está obligado a, en lo pertinente: (1) velar que los Comisionados Locales realicen sus funciones para así mantener un registro electoral actualizado y confiable; y **(2) velar que los acuerdos por unanimidad de los Comisionados Locales cumplan con la ley, la moral y el orden público**. Art. 4.4, 2020 LPR 58.

III.

A.

Por último, y por ser en extremo pertinente para la correcta disposición de la controversia ante nos, es menester recordar que, en nuestra jurisdicción, existe una jerarquía de fuentes del Derecho la cual estamos llamados a seguir. En cuanto al derecho puertorriqueño, esa jerarquía se nos presenta de la siguiente manera: (1) la Constitución del Estado Libre Asociado de Puerto Rico, como ley suprema; (2) las leyes aprobadas por la Asamblea Legislativa; (3) las reglas y reglamentos aprobados y promulgados bajo autoridad

de ley por los organismos públicos; y (4) las ordenanzas municipales. *Noriega v. Gobernador*, 122 DPR 650, 680 (1988); *Collazo Cartagena v. Hernández Colón*, 103 D.P.R. 870, 874 (1975). Véase, además, L. Muñiz Argüelles, *La Investigación Jurídica*, 4ta ed., Bogotá, Ed. Temis S.A., 2006, págs. 22-24.

Como vemos, luego de nuestra Constitución, las leyes gozan de primacía en el ordenamiento jurídico puertorriqueño. En ese escenario, coexisten las leyes ordinarias -- tanto generales como especiales -- y las distintas resoluciones legislativas.[42] Muñiz Argüelles, *op. cit.,* págs. 280-281.

Al respecto, nos señala el profesor Luis Muñiz Argüelles, en su obra *La Investigación Jurídica*, *supra*, que no todas las piezas legislativas pueden aplicarse como si gozaran de la misma naturaleza o tuvieran el mismo alcance. *Íd.* En consecuencia, al momento de escoger la norma pertinente entre varias piezas legislativas que pudieran ser útiles, debemos tener en consideración ciertos factores, tales como la ubicación de la norma en la jerarquía de las fuentes, la fecha de aprobación y el lenguaje utilizado por el legislador u organismo gubernamental. *Íd.* **En específico, cuando una ley posterior no contiene una cláusula derogatoria, para resolver cuál es la norma vigente debemos**

---

[42] "Separando la Constitución a un plano superior, por ser la Ley Suprema que crea la propia rama legislativa, se aprueba en nuestro sistema leyes ordinarias, generales y especiales, resoluciones legislativas, reglamentos administrativos, ordenes ejecutivas y ordenanzas municipales; todas con fuerza suficiente para hacerse cumplir". Muñiz Argüelles, *op. cit*., pág. 281.

**examinar no solo la jerarquía de éstas, sino también su incompatibilidad.** *Íd.* en la pág. 282.



B.

Así pues, son varios los mecanismos que la legislatura tiene a su disposición para cumplir con su encomienda de adoptar las leyes que rigen en el ordenamiento jurídico puertorriqueño. En lo pertinente, las resoluciones conjuntas representan "[a]ctos con fuerza de ley que siguen para su aprobación el curso normal de la legislación, pero para la realización de proyectos especiales de duración limitada que no requieren reglamentación permanente".[43] C. I. Gorrín Peralta, *Fuentes y procesos de investigación jurídica*, Orford, Equity Publishing Company, 1991, pág. 296.

En cuanto a ello, la Asamblea Legislativa dispuso que "[t]oda legislación que haya de perder su fuerza al realizarse la obra, o cumplirse la finalidad que persigue, será objeto de consideración por la Asamblea Legislativa mediante resolución conjunta y no formará parte de los estatutos permanentes de Puerto Rico". *Ley para Determinar los Asuntos que Deban ser Objeto de Consideración por la Asamblea Legislativa Mediante Resolución Conjunta*, Ley Núm. 2 de 4 de marzo de 1953, 2 LPRA sec. 200. Cónsono con lo

---

[43] Por su parte, "[l]as resoluciones concurrentes tratan sobre asuntos de la incumbencia de ambas cámaras legislativas y para declaraciones legislativas que no tienen fuerza de ley". Gorrín Peralta, *op. cit.*, págs. 296-297.

anterior, el Art. III, Sec. 18 de la Constitución del Estado Libre Asociado expresa que "[s]e determinará por ley los asuntos que puedan ser objeto de consideración mediante resolución conjunta, pero toda resolución conjunta seguirá el mismo trámite de un proyecto de ley". CONST. ELA art. III, § 18, LPRA, Tomo 1.

La anterior disposición constitucional fue objeto de amplio debate por la Convención Constituyente. Véase 2 DIARIO DE SESIONES DE LA CONVENCIÓN CONSTITUYENTE 856-863 (1951). En el trigésimo primer día de sesión, el delegado Antonio Reyes Delgado expresó su preocupación en cuanto a dicha cláusula, por entender que la misma sugería que la Asamblea Legislativa tenía la facultad de enmendar o modificar una ley o un código por virtud de una resolución conjunta. *Íd*. en la pág. 857. A su entender, ello se subsanaba clarificando que las resoluciones conjuntas solo considerarían *"asuntos especiales"*. *Íd*. Véase, *CRIM v. Méndez Torres*, 174 DPR 216 (2008) (Hernández Denton, opinión de conformidad).

No obstante, la enmienda propuesta fue derrotada por la oposición de los delegados Luis Negrón López y Celestino Iriarte, quienes entendían que la palabra *"especial"* no era necesaria. DIARIO DE SESIONES, *supra*, pág. 860. En síntesis, "[e]l consenso imperante en la Convención Constituyente fue que la resolución conjunta se podría utilizar como un mecanismo para legislar asuntos especiales y transitorios, 'sin otras consecuencias ulteriores'". *CRIM v. Méndez Torres*,

*supra*, pág. 238. **Lo anterior, sin lugar a duda, implica que una resolución conjunta no puede modificar, suspender o dejar sin efecto una ley que forma parte de los estatutos permanentes.** *Íd.*

**Así claramente surge de los debates de la Convención Constituyente, al sostenerse que "[n]unca se puede entender que la Asamblea Legislativa pueda enmendar los códigos y leyes de carácter general, [en] virtud de resoluciones conjuntas".** Diario de Sesiones, *supra*, pág. 857. Esto cobra mayor relevancia, cuando tenemos ante nuestra consideración una ley posterior -- como lo es el Código Electoral de 2020, *supra,* -- cuyas disposiciones, en lo pertinente, resultan irreconciliables con los actos que determinados funcionarios gubernamentales realizan en virtud de las facultades que le otorga una resolución conjunta, tal como la Resolución Conjunta Núm. 37-2020, *supra*, aquí en controversia.[44]

A modo de resumen, de lo anterior, claramente podemos colegir que una resolución conjunta tiene una duración

---

[44] Sobre este particular, resalta a nuestra atención que el caso que la Opinión Mayoritaria utiliza como fundamento para concluir que la Resolución Conjunta Núm. 37-2020 es, a su juicio, una ley especial que prevalece sobre el Código Electoral de 2020, *supra* -- *PSP, PPD, PIP v. Romero Barceló*, 110 DPR 248 (1980) -- trataba de un conflicto entre las disposiciones de dos (2) estatutos permanentes. Es decir, no estábamos ante una resolución conjunta, de carácter limitado y transitorio, y una ley permanente. Por ello, en aquel momento, este Foro concluyó que la ley especial posterior desplazaba al Código Electoral, aprobado con anterioridad a la misma.

En el caso que hoy nos ocupa, nos corresponde resolver el conflicto entre disposiciones irreconciliables de un estatuto permanente -- es decir, el Código Electoral de 2020, *supra* -- y una resolución conjunta aprobada con anterioridad a éste, la cual como bien expresó la Convención Constituyente, no puede enmendar los códigos y leyes de carácter general. En consecuencia, dicha jurisprudencia es claramente distinguible de la controversia ante nos.

limitada y goza de igual fuerza que las leyes ordinarias, razón por la cual la ciudadanía y el Estado están obligados a cumplirla. N. Rigual, *El poder legislativo de Puerto Rico*, San Juan, Ed. UPR, 1961, págs. 95-96. La diferencia entre una ley ordinaria -- ya sea de carácter general o especial -- y una resolución conjunta, estriba en que la primera trata medidas de carácter permanente cuya vigencia es ilimitada. *Íd.* Por el contrario, las resoluciones conjuntas son de carácter transitorio, por lo cual su vigencia culminará tan pronto se cumpla el propósito que la originó. *Íd.*

**Ahora bien, la Asamblea Legislativa, al ejercer las funciones que la Constitución les delega, puede variar lo dispuesto en dichas resoluciones a través de la aprobación de legislación posterior.** Mientras que, el deber de los tribunales se circunscribe a que se cumplan las disposiciones legislativas -- siempre y cuando estén dentro de los parámetros constitucionales así como otros principios básicos que permean en nuestro ordenamiento jurídico -- para lo cual acudimos a las reglas de hermenéutica que estamos llamados a aplicar con el fin de auscultar y obedecer la verdadera intención de la Rama Legislativa. Véase, R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. I, págs. 241-242.

IV.

De otro lado, "[c]uando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Art. 14 del Código Civil de Puerto Rico, 31 LPRA sec. 14. Véase, *Cordero v. ARPe*, 187 DPR 445, 456 (2012); *Mun. San Juan v. Banco Gubernamental de Fomento*, 140 DPR 873, 883-84 (1996). Conforme a este mandato, al interpretar un estatuto, debemos remitirnos -- en primer lugar -- al texto de la ley, pues **"cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa"**. *Juarbe v. Registrador*, 156 DPR 387, 393 (2002); *Santiago Meléndez v. Superintendente de la Policía de PR*, 151 DPR 511 (2000); *Alejandro Rivera v. ELA*, 140 DPR 538, 545 (1996).

Por ello, en el descargue de nuestra función interpretativa, los tribunales estamos llamados a armonizar, hasta donde sea posible, "[t]odas las disposiciones de la ley con el propósito de lograr una interpretación integrada, lógica y razonable de la intención legislativa". *CBS Outdoor v. Billboard One, Inc.*, 179 DPR 391, 417 (2010); *Matos v. Junta Examinadora*, 165 D.P.R. 741, 749 (2005). En otras palabras, no debemos interpretar las disposiciones de una ley de manera aislada, sino analizadas en conjunto, teniendo en consideración todo su contexto. *CBS Outdoor v. Billboard One, Inc., supra; Mun. San Juan v. Banco Gubernamental de Fomento,*

*supra*, pág. 884; *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 DPR 64, 90 (1983).

De esa forma, al evaluar las disposiciones de una ley, o de varias piezas legislativas que podrían ser de relevancia para un mismo asunto o controversia -- como lo serían las leyes ordinarias y las resoluciones conjuntas --, debemos determinar el efecto de aquella que plasma la más reciente intención del legislador. Para ello, dos son los factores a evaluar.

En primer lugar, resulta indispensable mencionar que las leyes solo se derogan por otras leyes posteriores, nunca por el uso, la costumbre o la práctica en contrario. Art. 5 del Código Civil de Puerto Rico, 31 LPRA sec. 5. Véanse, *Caribbean Petroleum Co. v. Depto. Hacienda*, 134 DPR 861 (1993); *Departamento de Hacienda v. Telefónica*, 164 DPR 195, 207-208 (2005). De otra parte, y como segundo factor a considerar, es necesario señalar que la derogación de una ley puede ser expresa o tácita. "Es expresa cuando se dispone literalmente en la ley derogatoria; tácita cuando la nueva ley contiene preceptos que son contrarios o irreconciliables con los de la ley anterior". Muñiz Argüelles, *op. cit.*, págs. 282-83.

Ahora bien, "[l]a derogación tácita debe ser tomada restrictivamente, de modo que, si sólo algunas disposiciones de la ley anterior resultan contradictorias con las de la nueva ley, sus demás disposiciones siguen en vigor". *Íd.* Ante

dos disposiciones legales antagónicas, deberá prevalecer la última voluntad del Legislador, que es aquella esbozada en la nueva ley. *Departamento de Hacienda v. Telefónica*, *supra*, pág. 208; *Aut. de Puertos v. Mun. de San Juan*, 123 DPR 496 (1989); *Pérez Vega v. Tribunal Superior*, 93 DPR 749 (1966).

Cónsono con lo anterior, esta Curia ha expresado que cuando los términos de una ley posterior son tan inconsistentes con los de una ley anterior, de forma tal que impide que subsistan juntas, se entiende que la posterior enmendó implícitamente la anterior, "[e]specialmente cuando el resultado de tal interpretación es dar efectividad a la intención legislativa".[45] *Rafael Rosario & Assoc., Inc. v. Depto. Familia*, 157 DPR 306 (2002); *Diaz Marín v. Mun. de San Juan*, 117 DPR 334, 344 (1986).

En consecuencia, cuando se trata de una enmienda a una parte de la ley, dejando inalterada otra parte, ambas deben ser interpretadas conjuntamente tratando de armonizarlas. *Departamento de Hacienda v. Telefónica*, *supra*. Véase, también, *A.J. Tristani v. Municipio*, 76 DPR 758, 765 (1954). De ello no ser posible, "[l]as disposiciones de la ley enmenda[dora] deben prevalecer como la última expresión de la voluntad legislativa". *Departamento de Hacienda v. Telefónica*, *supra*; *Aut. de Puertos v. Mun. de San Juan*, *supra*; *A.J. Tristani v. Municipio*, *supra.* Estas normas cobran

---

[45] Si bien estamos conscientes que en ese momento se utilizó el término "enmendó", entendemos que lo allí expresado es igualmente aplicable a lo discutido sobre derogación tácita.

mayor fuerza cuando el conflicto es entre un acuerdo de una agencia de la Rama Ejecutiva, otorgado en virtud de una Resolución Conjunta que para ello se le facultó, cuyo contenido es atendido con posterioridad mediante una ley de carácter permanente.

Es, precisamente, a la luz de la normativa antes esbozada, y no de otra, que procedía disponer de las controversias que nos ocupan. Como una mayoría de este Tribunal no lo hizo, procedemos -- desde el disenso -- a así hacerlo.

V.

Conforme mencionamos anteriormente, el Comisionado Electoral del PNP, el señor Sánchez Álvarez, nos invita a que validemos la Resolución Conjunta Núm. 37-2020, así como el Acuerdo otorgado por la Comisión Estatal de Elecciones. Arguye que, de lo contrario, ello tendría el efecto de anular la fecha de las primarias ya celebradas, del voto adelantando y del voto ausente, que están contempladas en la mencionada pieza legislativa.[46] A dicho pedido, en esta ocasión, no podemos acceder.

---

[46] Valga aclarar que no está ante nuestra consideración la incompatibilidad de la Resolución Conjunta y las disposiciones del Código Electoral de 2020, *supra*, sobre el voto adelantado y el voto ausente por lo que no nos corresponde pasar juicio sobre ello. De hecho, tal cual hemos señalado y reiteraremos más adelante, se trata de la improcedencia del Acuerdo una vez se aprobó el nuevo Código Electoral, *supra*. Asimismo, en cuanto a la celebración de las primarias, esta Curia ya justipreció dicho asunto en *Pedro Pierluisi-Urrutia y Eduardo Bhatia Gautier v. CEE y otros*, 2020 TSPR 82, 204 DPR ___ (2020).

Y es que, como ha quedado claramente demostrado, lo anterior sería, a todas luces, contrario a lo claramente dispuesto en Art. 5.17 del recién aprobado Código Electoral de 2020, *supra* -- **el cual tiene primacía sobre la mencionada Resolución Conjunta y sobre el Acuerdo objeto de estudio en el presente caso --**, y el que expresamente estableció el 30 de junio de 2020 como fecha para culminar el periodo de recusaciones. Fecha que no podía ser variada por los Comisionados Electorales, ni por el Presidente de la Comisión Estatal de Elecciones, una vez el mencionado cuerpo legal fue aprobado. Se presume que, al momento en que el Legislador aprueba la nueva ley, conocía de la existencia de la Resolución Conjunta aquí en controversia y de su contenido.

**Así pues, vigente el Código Electoral de 2020, *supra*, el Acuerdo que hoy el Comisionado Electoral del PNP nos pide validemos, perdió su eficacia, por lo que cualquier acto posterior realizado en virtud de este último es nulo y no podemos avalarlo.** No al menos el Juez que suscribe.

Si bien reconocemos la facultad que poseen los Comisionados Electorales de los distintos partidos para, junto al presidente de la Comisión Estatal de Elecciones, otorgar acuerdos con el fin de reglamentar los procedimientos electorales, no es menos cierto que los mismos no pueden contravenir las leyes que dicha entidad viene obligada a cumplir. Máxime, cuando validar la fecha propuesta por el referido Acuerdo, en estos momentos -- tomando en cuenta lo

atropellado que ha sido el proceso electoral este año --
tiene el efecto de menoscabar el derecho al sufragio
universal de un sinnúmero de puertorriqueños y
puertorriqueñas residentes en el Municipio de Cataño,
socavando así uno de los pilares básicos de nuestra
democracia.

VI.

Es, pues, por los fundamentos antes expuestos, que
enérgicamente disentimos del errado y lamentable proceder de
la Mayoría de este Tribunal en el día de hoy.

Ángel Colón Pérez
Juez Asociado